SOUTHWELL COMBING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.*

Docket Nos. 53842, 54484. Filed May 29, 1957.

*Edward C. Park, Esq.*, for the petitioner.
*James R. McGowan, Esq.*, for the respondent.

#### OPINION.

RICE, *Judge:* These consolidated proceedings involve deficiencies in income tax in the following amounts:

| Docket No. | Fiscal year ended June 30 | Deficiency |
| --- | --- | --- |
| 53842 | 1948 | $38, 990. 08 |
| | 1949 | 28, 640. 41 |
| | 1950 | 35, 223. 12 |
| 54484 | 1951 | 44, 121. 57 |
| | 1952 | 39, 103. 68 |
| | 1953 | 48, 741. 52 |

The issue for decision is whether the liquidation of petitioner's predecessor and transfer of its assets to petitioner constituted a taxable reorganization or whether it constituted a tax-free reorganization within the meaning of section 112 (g) (1) (D) of the 1939 Code.

Petitioner has conceded other issues raised by the pleadings.

All of the facts were stipulated, are so found, and are incorporated herein by this reference.

During the years in issue, the Southwell Combing Company (hereinafter referred to as the petitioner) maintained its principal place of business at North Chelmsford, Massachusetts. It filed its income tax returns with the former collector of internal revenue for

*This Findings of Fact and Opinion is superseded by 30 T. C. —— (1958).

the fourth district of Massachusetts for the years 1948 to 1952, and with the director of internal revenue for the fourth district of Massachusetts for the year 1953.

The Southwell Wool Combing Company (hereinafter referred to as the old company) was incorporated under Massachusetts law in 1922. It owned and operated two wool-combing plants in North Chelmsford, Massachusetts, at which it combed wool into tops and noils for top-makers on a commission basis.

In April 1947, the capitalization of the old company consisted of 35,000 shares of no-par stock, owned as follows:

| *William B. Smith Group* | *Shares* |
|---|---|
| William B. Smith Trust | 25,500 |
| Lida M. Hood | 1,600 |
| Mary H. Robertson | 1,000 |
| Elizabeth Hood | 1,000 |
| Arthur W. Atherton | 1,000 |
| Henry G. Hood | 400 |
| Jacob Reed | 2,000 |
| | 32,500 |
| *The Southwell Group* | |
| James Southwell | 2,000 |
| Philip H. Southwell | 300 |
| Evelyn S. Fessenden | 200 |
| | 2,500 |
| Total | 35,000 |

The conduct of the individuals comprising the Smith Group with respect to their stock was subject to the control of William B. Smith (hereinafter referred to as Smith), the sole trustee of the William B. Smith Trust. James Southwell was the father of Philip Southwell (hereinafter referred to as Southwell) and Evelyn S. Fessenden. Both James and Philip Southwell were actively engaged in the management and operation of the old company during 1947. They were the only compensated officers of that company during its fiscal year ended June 30, 1947, and for several preceding fiscal years.

Nichols & Company, Inc. (hereinafter referred to as Nichols), was a Massachusetts corporation engaged in the business of top-making. It purchased wool, had it converted into tops and noils at combing mills owned and operated by others, including the old company, and then sold those products. Nichols did not own a combing mill. During the 10 years prior to 1947, a shortage of combing facilities developed. For that reason, a number of top-makers, including Nichols, began seeking arrangements whereby they could assure themselves of adequate combing facilities.

In early 1947, Nichols learned that Smith was interested in disposing of his interest in the old company. Fearing the possible loss of its combing facilities should control of the business pass into the hands of a competitor, Nichols's president, Arthur O. Wellman (hereinafter referred to as Wellman), in early February 1947, entered into negotiations with Smith regarding the sale of the company's fixed assets. Shortly thereafter, Nichols abandoned any idea of purchasing the assets of the old company.

During that same period, Smith advised Southwell of his willingness to sell stock in the old company to Southwell, offering him the opportunity of purchasing the stock held by the Smith Group at $71.43 per share. Southwell approached Wellman and told him he was interested in acquiring control of the old company, but that he required financial assistance. In response, Wellman indicated he might form a group to aid Southwell. However, it was understood that Nichols was not interested in financing a stock purchase by Southwell alone. Wellman declared that Nichols wanted an assurance it would obtain an interest in the old company sufficient to insure that its combing facility needs would be satisfied. Southwell, in turn, was unwilling to subscribe to any plan unless he was granted the option of acquiring eventual control of the old company. More particularly, he wished to be assured of the right to acquire at least a 50 per cent interest in the business within a reasonable period of time.

Wellman made Smith a tentative offer to purchase all the stock in the old company, "or a sufficient number of shares of the stock to give us control," at $70 per share. Smith rejected that offer as being too low. On April 9, the following letter, as reproduced in pertinent part, was addressed to Smith by Wellman:

Dear Mr. Smith:

\* \* \* \* \* \* \*

I would like to explain why we do not want to consider over $70. a share and have you look at it from a purchaser's point of view. If it were not for taxes we would be glad to pay you a higher price for the mill. Let's take it for granted the mill will average to make half a million dollars a year. Federal and State governments take about $200,000. of this, which leaves $300,000.

Section 102 of the Federal Tax Law states that if dividends are not paid out they are subject to a tax of 27½% of the first $100,000. and 38½% on anything over $100,000. Therefore, we would find it advisable to pay this $300,000. out in dividends.

Fortunately our group are in the highest tax brackets and today they would have to pay over 84% of this money in taxes to both Federal and State which would leave only $48,000. a year that we could keep.

However, should taxes drop 20% it would mean that this group would be in the 70% bracket and we would be able to keep $90,000. a year. This amount is less than 5% return on our money which, for a business of this kind, is much too low.

This, to my way of thinking, is a very poor investment and we have offered much more money than we should. The only reason that we have offered such a high price is that we would like this combing to give to our customers. You do not have to worry so much about the customers as we do, but we live with them every day and feel more or less responsible to see that they have their top requirements. In this case you can see that we are even willing to pay such a high price for what is really a poor return on our money.

 * * * * * * *

 Very truly yours,

 NICHOLS & COMPANY, INC.
 /s/ Arthur O. Wellman,
 *President.*

 Between April 10 and April 24, Smith formally offered Southwell the 25,500 shares of stock in the old company which he controlled at $71.43 per share. At that time, he told Southwell he believed he could deliver not only those shares, but also the remaining shares held by the Smith Group.

 On April 24, Nichols and Southwell entered into an agreement by which Nichols agreed to purchase from Southwell any shares of the old company's stock which Southwell might tender within 60 days from the date of the agreement at a price of $71.43 per share. Nichols further agreed to resell to Southwell, upon his request, any stock so purchased at any time after 1 year and within 10 years of the agreement. Southwell, in turn, granted Nichols the right of first refusal on any shares he might sell during the 5 years immediately subsequent to the agreement.

 On April 25, 1947, Southwell agreed to purchase from Smith 30,500 shares of the old company's stock at $71.43 per share. Smith agreed to use his best efforts to effect a sale of the remaining 2,000 shares held by the Smith Group. Southwell deposited $50,000 with Smith, agreeing to pay the balance of the purchase price on or before May 14, 1947.

 On May 9, 1947, there was a closing of the Smith-Southwell purchase agreement. All stock in the old company, other than that owned by the Southwell Group, was purchased at $71.43 per share, as follows:

| Name | Number of shares received | Consideration paid |
| --- | --- | --- |
| Philip Southwell | 30, 890 | $2, 206, 472. 70 |
| Fredeline E. E. Southwell | 735 | 52, 501. 05 |
| Evelyn S. Fessenden | 875 | 62, 501. 25 |
| | 32, 500 | $2, 321, 475. 00 |

To finance that purchase, Southwell, on May 9, borrowed from Nichols $2,158,971.75 on his 60-day promissory note. The balance of the purchase price was made up of the $50,000 deposited by Southwell with Smith, and $112,503.25 furnished by the Southwell Group.

At a meeting held on May 9, 1947, the following were elected officers and directors of the old company:

James Southwell_____ Director, president
Philip H. Southwell_____ Director, treasurer, clerk
Henry F. Fessenden_____ Director
Evelyn S. Fessenden_____ Director

Henry F. Fessenden was the husband of Evelyn S. Fessenden.

On June 25, 1947, Southwell sold Nichols 21,000 shares of stock of the old company. That sale decreased the Southwell Group's interest in the old company to 40 per cent, and gave Nichols a 60 per cent interest. The proceeds of that sale were applied against Southwell's note, reducing the amount owed Nichols to $658,941.75. On June 26, the old company declared a 2-for-1 stock dividend of 70,000 shares on its outstanding 35,000 shares. On June 30, Southwell sold Nichols 15,750 shares of the old company's stock, thereby reducing the Southwell Group's interest to 25 per cent, and increasing that of Nichols to 75 per cent. The proceeds of that sale were likewise applied against his indebtedness to Nichols, reducing it to $283,934.25. On that same day, Southwell sold 1,500 shares to James Southwell for $35,715; 550 shares to Fredeline E. E. Southwell for $13,095.50; and 800 shares to Evelyn S. Fessenden for $19,048. Each party delivered to Southwell his demand note for the amount due from him.

On June 30, 1947, subsequent to the completion of the aforementioned transactions, the stockholders of the old company voted for a liquidation of the company and distribution of its assets. Accordingly, on that day, the old company transferred to its shareholders most of its assets, including its land, machinery, equipment, and cash subject to its outstanding liabilities, in consideration for which they surrendered their shares for cancellation. The old company was not dissolved until later in the year.

Nichols addressed the following letter to the members of the Southwell Group under date of June 30, 1947:

MADAMS AND GENTLEMEN:

This letter is to evidence our agreement with each of you to reimburse you an amount equal to any amount you may be required to pay the United States Government or the Commonwealth of Massachusetts as income tax on any gains realized by you in the liquidation of the Southwell Wool Combing Company.

We shall have the option of making such reimbursement to you by offering to accept and pay for bonds of Southwell Combing Company at a premium of $20 for each $100 of face value to the extent required to make such premiums equal your tax liabilities on account of such gains. If the option is exercised failure to tender the bonds shall terminate our liability hereunder.

Very truly yours,

NICHOLS & COMPANY, INC.
By /s/ Arthur Wellman

As a result of the distributions of cash received upon liquidation, James Southwell, Fredeline E. E. Southwell, and Evelyn S. Fessenden paid their notes to Southwell, who applied the amounts so received, along with the amount he realized upon the old company's liquidation, against his indebtedness to Nichols, reducing it to $158,931.75.

On July 1, 1947, the petitioner was incorporated under Massachusetts law. It accepted an offer from the shareholders of the old company to transfer to it all the assets, except $500,010 cash, they had received on liquidation of the old company. In exchange, petitioner agreed to issue to them its 6 per cent 10-year first mortgage bonds in the amount of $1,680,000, and all 28,000 shares of its authorized common stock. Petitioner further agreed to assume all obligations of the old company. Accordingly, the transfers were made, and the stock and bonds were issued in the following amounts:

| Name | Stock (number of shares) | Bonds (face amount) |
|---|---|---|
| James Southwell | 2,000 | $120,000 |
| Fredeline E. E. Southwell | 735 | 44,100 |
| Evelyn S. Fessenden | 1,075 | 64,500 |
| Philip H. Southwell | 3,190 | 191,400 |
| | 7,000 | $420,000 |
| Nichols & Company | 21,000 | 1,260,000 |
| | 28,000 | $1,680,000 |

On July 1, 1947, Southwell and Nichols entered into an agreement whereby Nichols agreed to sell Southwell any of petitioner's bonds which Nichols might own, at par plus accrued interest. It was further agreed that for every $3,000 of bonds redeemed or paid by petitioner, or so purchased by Southwell, Southwell should have the right to purchase from Nichols 50 shares of petitioner's common stock. However, Southwell's right to purchase such stock was subject to certain limitations. Prior to July 1, 1952, he could not purchase more than 7,000 shares. Thereafter, any purchase of stock was conditioned on the purchase, or retirement, of all the bonds held by Nichols, and the purchase of all the stock then remaining in Nichols's hands. The agreement further provided:

Nichols agrees to retain Bonds of the Company in the face amount of $200,000 subject to the terms of this Agreement, but may dispose of the balance of the Bonds acquired by it as it may see fit. Nichols also agrees that it will not dispose of any of the shares of the Company now held by it without providing that the shares transferred shall remain subject to the terms of this Agreement and to the rights to purchase of Southwell hereunder. A transfer of shares, to voting trustees who assume the Company's obligation to sell Southwell upon the terms and conditions hereinabove provided, shall be deemed a compliance with the terms of this paragraph. * * *

On July 1, 1947, and thereafter, petitioner maintained its manufacturing operations and principal place of business at the same plants where such had been maintained by the old company. The former operating personnel of the old company were also employed by petitioner. James Southwell, Philip H. Southwell, Evelyn S. Fessenden, and Henry Fessenden became directors of the new company. On July 1, they elected James Southwell president and Philip Southwell treasurer.

On July 9, Southwell's note to Nichols came due. In lieu of further payment, Southwell executed a new note in the amount of $158,931.75, the amount outstanding at that date.

On July 15, 1947, Nichols created a voting trust of the 21,000 shares of petitioner's stock which it held. It transferred those shares to Arthur O. Wellman, John H. Nichols, Jr., and Robert P. Hackett, its president, vice president, and treasurer, respectively, who were appointed voting trustees. They were made expressly liable for the performance of Nichols's July 1 agreement with Southwell relative to the latter's right to purchase those 21,000 shares. The beneficial interest in the trust was divided into 210 voting trust certificates which were to be issued to Nichols or its nominees. On July 16, these 210 certificates were issued to certain stockholders of Nichols. In consideration of that issuance, those stockholders paid Nichols $240,030. At no time prior to July 15, 1947, was there any contract in existence which required Nichols to transfer its interest in petitioner to any of its own shareholders.

On October 7, 1947, at a meeting of the old company's board of directors, its treasurer was authorized to execute an assignment to its shareholders of any remaining assets. Later in that month, those shareholders transferred to petitioner all assets received from the old company not previously transferred. On December 24, 1947, the old company was dissolved.

Southwell, on January 2, 1948, paid in full his indebtedness of $158,931.75 on his note to Nichols.

Petitioner retired the bonds issued upon its organization in the amounts and during the periods as indicated below. Also set forth are petitioner's net earnings for the periods wherein retirements were made:

| Taxable year ended June 30 | Face amount of bonds retired | Petitioner's net earnings |
|---|---|---|
| 1948 | $680,000 | $655,844.19 |
| 1949 | 300,000 | 421,196.97 |
| 1950 | 168,000 | 615,060.53 |
| 1951 | 532,000 | 530,569.32 |

The fair market value as of July 1, 1947, of the depreciable assets of the old company which were transferred to petitioner was not less

than $1,712,275.58. The value of those same assets on the books of the old company on June 30, 1947, after depreciation to that date, was $427,588.28. The petitioner took those depreciable assets on its books at their fair market value as of July 1, 1947, and claimed depreciation for the years in issue on that basis.

In his deficiency notice, respondent determined the liquidation of the old company and transfer of its assets to petitioner was, in effect, a tax-free reorganization under section 112 (g) (1) (D),[1] and therefore petitioner was required by section 113 (a) (7)[2] to use for depreciation purposes the same basis that such assets had in the hands of the old company. In support of that determination, he argues the instant reorganization commenced after Nichols had acquired its interest in the old company, and was completed before the voting trust was created; and that therefore, immediately after the transfer, the transferor's stockholders, Nichols and the Southwell Group, were in control of the business within the meaning of the statute.

On the other hand, petitioner's position is that the reorganization commenced prior to Nichols's acquisition of its interest in the old company, and was not completed until after the creation of the voting trust; and that therefore, immediately after the reorganization, the Southwell Group and Nichols's stockholders, and not the Southwell Group and Nichols, were in control of the transferee corporation. For reasons set forth below, we do not agree with petitioner.

A tax-free reorganization within the meaning of section 112 (g) (1) (D) occurs when a corporation transfers all or a part of its assets to another corporation, and immediately after the transfer, the transferor or its shareholders, or both, are in "control" of the transferee.[3] Where a tax-free reorganization has taken place, section 113 (a) (7)

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(g) DEFINITION OF REORGANIZATION.—As used in this section (other than subsection (b) (10) and subsection (l)) and in section 113 (other than subsection (a) (22))—

(1) The term "reorganization" means * * * (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred, * * *

[2] SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property ; except that—

\* \* \* \* \* \* \*

(7) TRANSFERS TO CORPORATION.—If the property was acquired—

\* \* \* \* \* \* \*

(B) in a taxable year beginning after December 31, 1935, by a corporation in connection with a reorganization,

then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. * * *

[3] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(h) DEFINITION OF CONTROL.—As used in this section the term "control" means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

requires that the basis of the property acquired be the same in the hands of the transferee as it was in the hands of the transferor. That the transferor's stockholders may have acted as a conduit for the delivery of its assets to the transferee does not change the result. *Richard H. Survaunt*, 5 T. C. 665 (1945), affd. 162 F. 2d 753 (C. A. 8, 1947).

Whether the requisite "control" has survived an exchange so as to bring it within the provisions of section 112 (g) (1) (D) depends on the factual situation existing at the beginning as well as at the end of the particular transaction. *Republic Steel Corporation* v. *United States*, 94 Ct. Cl. 476, 40 F. Supp. 1017 (1941); *Walter S. Heller*, 2 T. C. 371 (1943), affd. 147 F. 2d 376 (C. A. 9, 1945), certiorari denied 325 U. S. 868 (1945). We must therefore decide at what point during the instant series of events the reorganization commenced, at what point it was completed, and who were the stockholders at both times.

In an attempt to show the reorganization began prior to June 25, 1947, the date Nichols first acquired an interest in the old company, petitioner refers to an affidavit and a letter of Wellman which were attached as exhibits to the stipulation. The respondent did not object to the affidavit and stipulated that with respect to the letter Wellman, if called as a witness by petitioner and asked to testify in explanation of the liquidation of the old company and the creation of a new company, would testify in accordance with the tenor of that letter. Wellman indicated that at the time of Nichols's loan to Southwell, May 9, 1947, both Nichols and Southwell contemplated repayment of the amount advanced by funds derived in part from the liquidation of the old company, and in part from funds secured from the sale of petitioner's stock. Wellman further indicated that the parties desired to revise the capital structure of the business in order to facilitate Southwell's acquisition of control. Finally, he indicated that the parties were aware of the favorable tax consequences of a taxable reorganization and wished to take advantage of them.

While these considerations may have been prominent in the minds of the parties, in the light of the record they do not support a conclusion that the reorganization commenced before June 25, 1947. In fact, we can only conclude that as of May 9, 1947, the parties anticipated the continuation of the old company for at least a 5-, and more probably a 10-, year period. That is the only conclusion which can be drawn from the terms of the Nichols-Southwell agreement of April 24, obviously executed in anticipation of the May 9 advance, calling for (1) Nichols's purchase of any of the old company's stock tendered by Southwell within 60 days of the agreement; (2) the resale to Southwell at any time after 1 and within 10 years of the agreement, on Southwell's request, of the old company's stock so purchased; and (3)

Nichols's right of first refusal on all sales by Southwell of the old company's stock made within the 5 years next succeeding the agreement. Moreover, while the parties may have truly desired to revise the capital structure of the business and also take advantage of the favorable tax consequences of a taxable reorganization, these facts standing by themselves, do nothing in the way of establishing a commencement date for the reorganization. It was necessary that the petitioner expressly show that the decision to reorganize was adopted at some point prior to June 25, 1947. It failed to do that, and we must therefore sustain the respondent's determination that the reorganization began no earlier than that date.

But the petitioner further contends that regardless of when the reorganization began, it was not concluded until Nichols created the voting trust on July 15, and therefore, immediately after the exchange, control of the business was in the hands of the Southwell Group and Nichols's stockholders, as opposed to the Southwell Group and Nichols. We find no merit in that contention.

Where, as here, a situation discloses a series of steps taken by the parties in a reorganization, it is essential to decide whether that series should be considered as a single, indivisible unit, or whether each step should retain its separate identity. If we should consider the reorganization as an integrated unit, transitory phases which add nothing of substance to the completed affair may be disregarded. *Helvering* v. *Limestone Co.*, 315 U. S. 179 (1942). Generally, the test applied in deciding whether a series of steps in a reorganization are to be considered as a single transaction or as separate steps is that of the mutual interdependence of the steps, or, stated differently, were the steps so mutually interdependent that the legal relationships created by one would have been fruitless without the completion of the entire series? *Commissioner* v. *National Bellas Hess*, 220 F. 2d 415 (C. A. 8, 1955), affirming 20 T. C. 636 (1953) ; *American Bantam Car Co.*, 11 T. C. 397 (1948), affd. 177 F. 2d 513 (C. A. 3, 1949), certiorari denied 339 U. S. 920 (1950). In applying that test to the facts before us, we can only conclude that the voting trust created on July 15, 1947, was not an essential part of the reorganization plan, in the absence of which the old company would never have been reorganized into the new

Had the parties considered creation of the voting trust an integral step in the over-all plan, it is reasonable to assume they would have expressly provided for it during the negotiations which culminated in the exchange. The argument that Wellman's letter to Smith on April 19 indicated the shares of the old company would be held by a group of individuals, therefore giving rise to the inference that the trust was contemplated as of that early date, is without substance. That letter was written at a time when Nichols was negotiating for a

purchase of the old company's stock in its own right at $70 a share. Those negotiations failed, and another approach was adopted. It was not until the agreement of July 1, providing for Southwell's repurchase of the new company's stock from Nichols, that any mention of the trust was made. Even then the parties did not commit themselves irrevocably to the creation of the trust, but rather recited that a transfer of petitioner's stock to trustees who would assume Nichols's obligation to sell to Southwell would not be considered a breach of that agreement. In point of fact, at no time prior to July 15, 1947, was there any contract in existence which required Nichols to transfer petitioner's stock in trust for the benefit of stockholders. We are of the opinion that the creation of the trust was not an interdependent step, and it should be disregarded as adding nothing of substance to the completed reorganization. We, therefore, conclude respondent properly determined that all steps necessary to complete the reorganization had been taken before July 15, 1947.

Finally, petitioner argues Nichols's stock ownership in the old and the new companies during the period June 25 to July 15 was merely a procedural step in the reorganization, and should be disregarded as being transitory in nature. That is so, it contends, because Nichols only assumed the role of financier in the entire affair, and, in fact, was a conduit through which actual control of the business was funneled from the Smith Group to the participants in the voting trust. The record does not support such a conclusion.

Nichols's primary motive for entering the transaction was a desire to protect its combing facilities. Realizing a sale to hostile interests might destroy its source for processed goods, it joined with Southwell to acquire necessary control of the enterprise. At the outset, its participation was conditioned on its right to obtain an interest in the business of sufficient size to insure control of the old company's facilities. Through Wellman, it made known it had no interest in financing a stock purchase by Southwell alone. Had Nichols been denied the right of stock ownership in the old company, we are convinced it would not have invested anything in the transaction. We are also convinced its financial assistance was vitally necessary to the accomplishment of the stock purchase from the Smith Group. Moreover, by virtue of its July 1, 1947, agreement with Southwell, Nichols assured itself of at least 50 per cent control of the new corporation until July 1, 1952, a period of some 5 years. These facts contradict petitioner's argument that Nichols played a passive role in the entire affair. On the record, we are convinced that its ownership of stock in both companies was an interdependent step in the transaction without which the reorganization would not have been accomplished.

We have concluded the reorganization commenced no earlier than June 25, 1947, and was completed prior to July 15 of that year. We

564

have also concluded Nichols's stock ownership in the business during the period from June 25 to July 15 was an integral part of the entire transaction. Therefore, immediately after the transfer, the transferor's shareholders were in control of the transferee, as contemplated by section 112 (g) (1) (D), and it follows that a tax-free exchange occurred, and that petitioner's basis for the depreciable assets received was the same as that of its transferor.

*Decisions will be entered for the respondent.*