**Alfred H. TURECAMO and Frances M. Turecamo, Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

**No. 1027, Docket 76–4014.**

United States Court of Appeals, Second Circuit.

Argued Aug. 18, 1976.
Decided May 9, 1977.

Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Leonard J. Henzke, Jr., William S. Estabrook III, Tax Div., Dept. of Justice, Washington, D. C., for appellant.

Michael H. Simonson, New York City, for appellees.

Before VAN GRAAFEILAND, Circuit Judge, KELLEHER * and GAGLIARDI,** District Judges.

GAGLIARDI, District Judge:

The Commissioner of Internal Revenue ("the Commissioner") here appeals the decision of the Tax Court permitting Alfred and Frances Turecamo ("the taxpayers") to claim Mrs. Turecamo's mother, Mrs. Kavanaugh, as a dependent pursuant to Section 152(a) of the Internal Revenue Code ("the Code"), 26 U.S.C. § 152(a), and to claim certain attendant tax deductions. The single issued raised on this appeal may be stated simply: Are Basic Medicare hospitalization benefits paid pursuant to Part A of Subchapter XVIII of the Social Security Act[1] to be considered support provided by the Medicare beneficiary for the purposes of determining whether a related taxpayer may claim the beneficiary as a dependent under the dependency support test of § 152(a) of the Code? The Tax Court concluded that for these purposes Basic Medicare benefits are not to be considered support furnished by the recipient. For the reasons stated below, we agree and affirm.

*The Facts*

The material facts are undisputed. In 1970 Mrs. Kavanaugh was 81 years old and lived with the Turecamos, her son-in-law and daughter, in their home. On August 5, 1970 Mrs. Kavanaugh was admitted to the Long Island Jewish Hospital in New Hyde Park, New York, where she remained until her discharge on October 9, 1970. On that date she returned to the taxpayers' home and continued to reside there until her death in December, 1970.

The total hospital bills incurred by Mrs. Kavanaugh were $11,095.75, of which $10,-434.75 was paid by Medicare allowances pursuant to the provisions of Part A of Subchapter XVIII of the Social Security Act, "Hospital Insurance Benefits for Aged and Disabled," 42 U.S.C. §§ 1395c to 1935i–2. The taxpayers paid the balance of the hospital charges not covered by Part A as well as all of the additional costs of nursing care required when Mrs. Kavanaugh was at their home. They thus paid a total of $3,531.00 in medical expenses on her behalf in 1970.

---

* Of The Central District of California, sitting by designation.

** Of The Southern District of New York, sitting by designation.

1. Subchapter XVIII (commonly referred to as "Medicare") was added to the Social Security Act, 42 U.S.C. §§ 301 *et seq.*, as Title XVIII, Health Insurance for the Aged, of the Social Security Amendments of 1965, Pub.L.No. 89–97, 79 Stat. 286. Subchapter XVIII is now codified as 42 U.S.C. §§ 1395–1395*ll* (1970), as amended, 42 U.S.C. § 1395–1395pp (Supp. V 1975). The disabled were first covered under Pub.L. 92–603, 86 Stat. 1329 (1972).

The Medicare statutory framework, Subchapter XVIII of the Social Security Act, consists of three interrelated parts. Part A of Subchapter

XVIII, 42 U.S.C. § 1395c to 1395i–2, is now entitled "Hospital Insurance Benefits for Aged and Disabled" (hereinafter "Part A" or "Basic Medicare" benefits) and provides insurance for hospital and related posthospital services. Part B of Subchapter XVIII, 42 U.S.C. §§ 1395j–1395w, is entitled "Supplementary Medical Insurance Benefits for Aged and Disabled" ("Part B" or "Supplementary" benefits) and provides insurance for supplemental medical services, primarily physicians' care and other health costs not covered by the basic Part A plan. Part C of Subchapter XVIII, 42 U.S.C. §§ 1395x–1395pp, "Miscellaneous Provisions," essentially sets forth definitions of terms used in Parts A and B. These Parts are discussed at length *infra*.

That year the taxpayers also provided Mrs. Kavanaugh with several rooms in their home for her use as an apartment. In sum, the taxpayers provided Mrs. Kavanaugh with food, lodging, clothing and entertainment worth approximately $4,000. Although Mrs. Kavanaugh received $1,140 in social security benefits which she applied toward her support, she did not reimburse the taxpayers for any of the expenditures made by them on her behalf.

Acting on the assumption that they had provided more than half of Mrs. Kavanaugh's support in 1970 and that consequently she qualified as their dependent, as provided in § 152(a) of the Code,[2] the taxpayers claimed an additional dependency exemption on their 1970 joint federal income tax return and also listed $3,531 as deductible medical expenses paid on her behalf.[3]

The Commissioner disallowed the taxpayers' claims, ruling that the $10,434.75 in Part A Basic Medicare payments made on behalf of Mrs. Kavanaugh were to be considered as having been contributed by Mrs. Kavanaugh herself in determining whether she could be claimed as a dependent by the Turecamos. In so ruling the Commissioner relied on his previous decision in Rev.Rul. 70–341, 1970–2 C.B. 31, in which he characterized Part A Basic Medicare benefits as social security payments and thus, in accordance with the traditional tax treatment of governmental disbursements made in furtherance of social welfare objectives (discussed *infra*), he ruled that Basic Medicare payments are includible as the recipient's own contribution to her support in determining who had provided more than one-half of her support under the § 152(a) dependency support test.[4] As a result of the inclusion of the Basic Medicare payments in the computation of Mrs. Kavanaugh's support, it was held that the Turecamos did not meet the § 152(a) dependency support test because they had failed to establish that they had provided over half of Mrs. Kavanaugh's support.[5] Consequently,

2. Section 152 of the Internal Revenue Code provides in pertinent part:
 § 152.
 (a) *General Definition.*—For purposes of this subtitle, the term "dependent" means any of the following individuals over half of whose support, for the calendar year in which the taxable year of the taxpayer begins, was received from the taxpayer (or is treated under subsection (c) or (e) as received from the taxpayer):
 * * * * * *
 (4) The father or mother of the taxpayer, or an ancestor of either,
 * * * * * *
 (8) A son-in-law, daughter-in-law, father-in-law, mother-in-law, brother-in-law, or sister-in-law of the taxpayer, . . .

3. The statutory bases for these claims, Sections 151 and 213 of the Code, are discussed in detail, *infra*.

4. After noting the dependency support test of Section 152(a) of the Code, Rev.Rul. 70–341, *supra*, 1970–2 C.B. at 32, states:
 In computing the amount that is contributed to the support of the individual, there must be included any amount that is contributed by such individual for his own support, including amounts that are ordinarily excludable from gross income such as social security payments. For example, Revenue Ruling 57–344, C.B. 1957–2, 112 holds that child insurance benefits under Title II of the Social Security Act received and used for the support of a child are considered the child's contribution to his support in determining who furnished more than one-half of the child's support. Likewise, it is held that basic medicare benefits received by (or on behalf of) an individual are includible as the individual's own contribution to his support in determining who provided more than one-half of his support.
 Conversely, supplementary medicare benefits, being in the nature of medical insurance proceeds, are not includible in the support computation of the individual by whom (or on whose behalf) they were received. However, the premiums paid for supplementary medicare coverage are includible in the support computation and are attributable to the person who furnishes the premiums. Revenue Ruling 64–223, C.B. 1964–2, 50.

5. The support calculations, in approximate figures, are as follows: If the $10,400 in Part A Basic Medicare benefits are held to be includible as support attributed to Mrs. Kavanaugh herself, the taxpayers will have provided only $7,500 out of over $19,000 expended in total support costs on her behalf. If the Part A payments are disregarded for the purposes of Mrs. Kavanaugh's support computation, her aggregate support costs for 1970 will amount to only $8,600 and the taxpayers' contribution of $7,500 will constitute well over half of that

they were not entitled to claim her as a dependent and the additional personal exemption and medical expenses deduction were denied. A resulting tax deficiency was assessed.

The Tax Court overruled the Commissioner and held that the Part A Basic Medicare benefits paid out on behalf of Mrs. Kavanaugh are not to be included in the computation of the support furnished by the recipient-dependent. 64 T.C. 720 (1975). With the amount constituting Part A benefits thus disregarded by the Tax Court, the Turecamos' expenditures on behalf of Mrs. Kavanaugh easily made up more than one-half of her total support, as required by § 152(a) of the Code. *See* footnote 5, *supra*. The dependency claims were therefore allowed and it was determined that no tax deficiency existed.

We affirm the Tax Court's holding that Part A Basic Medicare benefits are to be excluded from a calculation of the recipient's total support for purposes of the dependency support test of § 152(a) of the Code on two separate analytical grounds. A proper determination of the issue on each ground requires, as a general preliminary matter, a consideration of the dependency exemption provisions of the Internal Revenue Code of 1954 and a review of the kinds of financial benefits traditionally included or excluded from the support test of those provisions.

We have compared the characteristics of these financial benefits which determine their support test consequences with the relevant characteristics of Part A payments. As appears more fully below, based upon this comparison and upon an analysis of the provisions and legislative history of the entire Medicare statute, Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395pp, we are unable to conclude that benefits paid pursuant to Part A, Basic Medicare, should be treated any differently from those paid out under private insurance policies or under Part B, Supplementary Medicare, which are disregarded when calculating the beneficiary's support, as the Commissioner concedes.

We are led to the same conclusion independent of this analysis of the statutory provisions of Part A and the comparison of it with other benefits. In the present case, a consideration of the absence of economic impact of the receipt of Part A benefits on the recipient's financial relationship with the Turecamos convinces us that Part A benefits should not be included as an element of the recipient's total support.

*Section 152(a) Support Dependency Test*

Section 152(a) of the Code permits a taxpayer to claim as his dependent any of certain qualified individuals, including his mother or mother-in-law, if he has provided more than half of that individual's support during the taxable year in question.[6] For

total, thus satisfying the requirements of § 152(a) of the Code.

**6.** The predecessor of the support dependency test now embodied in § 152(a) of the Code was § 25(b)(3) of the Internal Revenue Code of 1939. Section 25(b)(3) was added to the 1939 Code as § 10(b) of the Individual Income Tax Act of 1944, 58 Stat. 231. It appears from the pertinent legislative history that the 1944 enactment of the predecessor of § 152(a) was intended both to simplify the provisions allowing a "dependency" credit and to liberalize their effect by focusing attention on the economic relationship maintained between the claimed dependent and the claiming taxpayer; the self-supporting capacity or incapacity of the claimed dependent was to be disregarded. As noted by the Senate Committee on Finance, under "definition of dependent",

The bill simplifies the definition of a dependent and the treatment of dependent's income. The present requirements that a dependent be under 18, or mentally or physically unable to support himself, are eliminated. Instead, there will be substituted the concept that a dependent is anyone for whom the taxpayer furnishes over half the support, provided that the person is closely related to the taxpayer and is not himself required to file a return. . . . This will permit a credit for dependents over 18 who are in fact supported by the taxpayer. The present law requirement that a "dependent" over 18 must be incapable of self-support is unnecessarily limited and confusing.

S.Rep. No. 885, 78th Cong., 2d Sess., *reprinted in* [1944] U.S.Code Cong.Service 1056, 1061; 1944 C.B. 858, 861. *See also id.* [1944] U.S. Code Cong.Service at 1083; 1944 C.B. at 880.

each individual determined to be his dependent under the § 152(a) support test, the taxpayer may claim an additional personal exemption pursuant to § 151(e) of the Code. In addition, § 213 of the Code allows the taxpayer to take medical expense deductions for certain expenditures made for the medical care of himself, his spouse, and "dependents (as defined in Section 152)."

 In order to prove the dependency status claimed under § 152(a) and to take advantage of the consequent tax benefits under §§ 151(e) and 213 of the Code, the taxpayer must first establish the total support costs expended on behalf of the claimed dependent from all sources and then demonstrate that over half of this amount was provided by the taxpayer. *See, e. g., Hogg v. U. S.*, 428 F.2d 274, 283 (6th Cir. 1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 871, 27 L.Ed.2d 808 (1971); *Klofta v. U. S.*, 333 F.Supp. 781 (N.D.Ohio 1970); *Hopkins v. Commissioner*, 55 T.C. 538, 541 (1970). In this respect "support" is broadly defined to include "food, shelter, clothing, medical and dental care, education, and the like," Treas.Reg. § 1.152–1(a)(2)(i). For the purposes of determining whether the taxpayer who is claiming the individual as a dependent has provided more than half of that individual's support, "there shall be taken into account the amount of support received from the taxpayer as compared to the entire amount of support which the individual received from all sources, including support which the individual himself supplied." *Id.* Thus, as a general rule under the support test, the medical expenses of an individual, including extraordinary hospitalization expenses, are to be considered part of his support. Payment of these extraordinary expenses plainly constitutes support supplied by the individual himself if made by him, while if made on his behalf by a third party is to be considered support received from that third party. Thus it is conceded by both parties here that if the Turecamos had themselves paid the extraordinary hospitalization costs which were incurred by Mrs. Kavanaugh and actually covered by Part A benefits, that payment would have been included in her support calculation and would have been attributed to the Turecamos.

 However, when the cost of medical care is covered by privately obtained health or hospitalization insurance there is an exception to the otherwise broadly inclusive definition of support of Treas.Reg. § 1.152–1(a)(2)(i), *supra*. In Rev.Rul. 64–223, 1964–2 C.B. 50, the Commissioner ruled that where an individual is covered by a renewable term policy providing insurance against medical costs, the proceeds paid by the insurance company are to be disregarded in computing the individual's support. The rule involved in determining the "support" components of such insurance coverage is that it is the cost of the premiums paid to obtain the insurance, not the medical expenses paid for by the proceeds of the policy, which represents the individual's support.[7] *Accord, Mawhinney v. C. I. R.*, 355

No substantive changes in the definition of dependent were intended by Congress when it enacted the 1954 Internal Revenue Code, *see* H.R.Rep. No. 1337, 83rd Cong., 2d Sess., *reprinted in* [1954] U.S.Code Cong. & Ad.News 4017, 4043 and 4178. Consequently the nature of the financial relationship between the claimed dependent and the taxpayer remains the determinative factor under the support dependency test.

7. Rev.Rul. 64–223, 1964–2 C.B. at 51, reads in pertinent part:

The extent to which medical expenses of an individual enter into his "support" for purposes of determining whether a taxpayer may claim him as a dependent is to be determined under the following rules:

(1) Where the taxpayer or the individual is covered under a renewable term policy which provides insurance against the cost of medical care (whether payment is made directly to hospitals and doctors or reimburses the policyholder), the policyholder will be considered as having furnished the care since the policyholder, under a privately financed medical insurance plan, is regarded as providing medical care for himself and the other beneficiaries of the policy. In determining (a) the total amount of support of the individual, and (b) the amount contributed to support by the individual himself or by the taxpayer claiming him as a dependent, the amount paid by the insurance company should be disregarded and only the premiums paid on the policy and the unreimbursed por-

F.2d 462 (3d Cir. 1966), *aff'g per curiam* 43 T.C. 443 (1965); *contra, Samples v. U. S.,* 226 F.Supp. 115 (D.Ga.1963). In conformity with this principle, the Commissioner has ruled that the supplementary medical insurance benefits of Part B of Subchapter XVII are excludible from the recipient's support because they are "in the nature of medical insurance proceeds." Rev.Rul. 70–341, *supra,* 1970–2 C.B. at 32.

Thus, if the Basic Medicare payments made on behalf of Mrs. Kavanaugh were treated in the same manner as private insurance proceeds or as Part B benefits for purposes of the § 152(a) dependency test, they would not be included as an element of the total support expended on her behalf and, consequently, the taxpayers' dependency claim would be upheld.

The Commissioner, however, ruled below and argues on this appeal that the Part A Basic Medicare payments are not in the nature of individual medical insurance proceeds but are instead governmental disbursements made in the furtherance of social welfare objectives. The result of such a characterization, it is argued, is that the Part A benefits should be regarded as amounts paid by Mrs. Kavanaugh for her own support, for the Commissioner points to an established line of authority holding that state welfare benefits which pay for basic human necessities are attributable to the recipient on whose behalf the payments were made.

For example, in *Lutter v. Commissioner,* 61 T.C. 685 (1974), *aff'd per curiam,* 514 F.2d 1095 (7th Cir.), *cert. denied,* 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 260 (1975),

payments made to an indigent parent under the Federal-State "Aid to Families with Dependent Children" (AFDC) program, Subchapter IV of the Social Security Act, 42 U.S.C. §§ 601–644, were held to constitute support provided for the children by the State in assessing whether the parent had provided more than half the children's support. The Tax Court had previously ruled in *Donner v. Commissioner,* 25 T.C. 1043 (1956), that payments made by a state Department of Public Welfare for the benefit of the taxpayer's institutionalized invalid child were to be deemed elements of the child's support not provided by the parent. *Accord,* Rev.Rul. 71–468, 1971–2 C.B. 115, acquiescing in *Carter v. Commissioner,* 55 T.C. 109 (1970) (state old-age assistance payments actually expended on support costs by recipient held support furnished by state); *Newman v. Commissioner,* 28 T.C. 559 (1957).

Under this same principle of including governmental welfare benefits in the total "support" of the recipient, a principle which he now seeks to apply to Part A Basic Medicare payments, the Commissioner has routinely ruled that benefits received pursuant to Federal Old Age, Survivors, and Disability Insurance ("OASDI"), Subchapter II of the Social Security Act, 42 U.S.C. §§ 401–431, constitute support furnished by the recipient for purposes of the dependency test of § 152(a) of the Code. *See, e. g.,* Rev.Rul. 58–419, 1958–2 C.B. 57, expanded by Rev.Rul. 64–222, 1964–2 C.B. 47 (OASDI benefits received by insured and spouse constitute support attributable to them for dependency test); Rev.Rul. 57–344, 1957–2 C.B. 112 (OASDI benefits received by child

---

tion of the expenses for medical care should be taken into account.

Section 213(e) of the Code as cited above, indicates that amounts paid for accident or health insurance constitute "medical care". The inclusion in the computation of support of such payments has been recognized by the Tax Court in several cases, although the precise question has never been presented. *Lena Hahn,* 22 T.C. 212 (1954); *Donald Lopez,* T.C. Memo 1959–9; *James Parker,* T.C. Memo 1959–182; *William Peery,* T.C. Memo 1962–202; *John J. Mora,* T.C. Memo 1964–122. Recently, the United States District

Court for the Northern District of Georgia held in *Samples v. United States,* 226 Fed. Supp. 115 (1963) that the benefits received under a health policy must be included in support in determining dependency. The question now presented is whether the premiums paid and the benefits received should be included in support. In considering the question, the Service has reached the conclusion that to include both premiums and benefits in support would in essence be duplication and that the cost of the insurance is the proper amount to be included. Accordingly, the *Samples* case will not be followed.

of retired or deceased individuals deemed support provided by that child rather than by parent or guardian in determining who furnished more than half of the child's support).

### Part A Basic Medicare

The Commissioner's claim that Part A Basic Medicare hospital insurance benefits must be included in a computation of the beneficiary's support for purposes of the dependency support test of § 152(a) of the Code thus rests on his contention that Part A benefits are properly characterized as social insurance or welfare benefits, not individual insurance proceeds. However, as previously indicated, our examination of Part A convinces us on two separate grounds that the Tax Court was correct in excluding Basic Medicare hospitalization benefits from the calculation of Mrs. Kavanaugh's support. Upon an analysis of the Medicare statute in its entirety and in light of the relevant legislative history, we are not inclined to disturb the Tax Court's conclusion that, for purposes of the § 152(a) support test, no valid basis exists for distinguishing between hospitalization benefits received under Part A of Medicare and either private insurance proceeds or supplementary benefits received under Part B. In addition to this statutory analysis we believe that a practical consideration of the extraordinary nature of the receipt of Part A benefits from the perspective of their economic impact on the financial relationship which the recipient, Mrs. Kavanaugh, has maintained with the Turecamos, warrants the exclusion of Part A benefits from the recipient's support calculation.

### Statutory Analysis

■ Federal Health Insurance for the Aged and Disabled was first enacted by Congress in 1965 as Subchapter XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395*ll* (1970), as amended, 42 U.S.C. §§ 1395–1395pp (Supp. V 1975). This sub-

chapter was passed into law for the specific purpose of providing a coordinated and comprehensive approach to federal health insurance and medical care for the aged.[8] Subchapter XVIII consists of one common definitional part, Part C, 42 U.S.C. §§ 1395x–1395pp, and two substantive parts, Part A, 42 U.S.C. §§ 1395c to 1395i–2, and Part B, 42 U.S.C. §§ 1395j–1395w, which together provide essentially the same health insurance protection as is furnished by comprehensive medical insurance plans underwritten by private insurers.

The Part A provisions for insurance against basic hospitalization costs are made available to all persons aged 65 and older who are entitled to monthly cash payments under Federal Old-Age Survivors, and Disability Insurance benefits (42 U.S.C. §§ 410–431) or to similar payments under the railroad retirement system. 42 U.S.C. § 1395c. This insurance covers in-patient hospital services, post-hospital extended care and home health services, and out-patient hospital diagnostic services. 42 U.S.C. §§ 1395d and 1395e. These services are paid for from a separate and self-supporting trust fund, the Federal Hospital Insurance Trust Fund, 42 U.S.C. § 1395i, which is financed by a separate compulsory payroll tax on the wages of employees, § 3101(b) and by an employer's excise tax § 3111(b) of the Code, and on earnings of self-employers, § 1401(b) of the Code. Individuals who have not become eligible for Part A benefits by qualifying for social security coverage and by paying the compulsory wage tax may choose to enroll in the program by paying voluntary monthly premiums. 42 U.S.C. § 1395i–2. The payroll taxes and voluntary contributions are calculated to insure the actuarial soundness and self-supporting character of the Trust Fund. 42 U.S.C. § 1395i(b).[9] Payments for facilities and medical care pursuant to Part A are made directly by the government to the hospital or other institution which furnished the services. 42 U.S.C. § 1395f(a).

---

**8.** H.R.Rep. No. 213, 89th Cong., 1st Sess. 2 (1965).

**9.** *See* H.R.Rep. No. 213, 89th Cong., 1st Sess. 47–49 (1965); S.Rep. No. 404, 89th Cong., 1st Sess. 55–57 (1965); S.Rep. No. 1230, 92nd Cong., 2nd Sess. 179 (1972).

Daily administration of the Part A Basic Medicare disbursements program has been largely assigned to private organizations, termed "fiscal intermediaries", which are named by the provider or group of providers. 42 U.S.C. § 1395h. These intermediaries, which are frequently health and accident insurance companies (such as Blue Cross organizations), contract with the Department of Health, Education and Welfare to act as its disbursing agents. *Id.*

Part B of the Medicare system, which provides coverage for supplementary medical services, constitutes a voluntary insurance program for which persons aged 65 and older, 42 U.S.C. § 1395o, are eligible to enroll to obtain benefits in return for the payment of monthly premiums, as established by the Secretary of H. E. W., 42 U.S.C. §§ 1395p, 1395r(b) and (c). The premiums paid by enrollees, together with matching Government contributions, 42 U.S.C. § 1395w, are deposited into the Federal Supplementary Medical Insurance Trust Fund, 42 U.S.C. § 1395t, to pay for the benefits provided by Part B, 42 U.S.C. §§ 1395l(a) and 1395t(g), including physicians' and diagnostic services, outpatient physical therapy and home health services, 42 U.S.C. §§ 1395k and 1395x(s).

As under Part A, the day-to-day administration of Part B is undertaken through private intermediary entities acting as agents for HEW. These entities, entitled "carriers", 42 U.S.C. § 1395u, determine the amounts of compensation due, according to the "reasonable charges" for the services provided, and make the actual payments. 42 U.S.C. §§ 1395l(a)(1) and (a)(2)(A). Reimbursement payments are made only for services found to be medically necessary, 42 U.S.C. § 1395y(a)(1).

Part C establishes common definitions for the essential terms applicable to both Parts A and B. A "provider", for instance, whether a hospital facility or a home health agency, 42 U.S.C. § 1395x(u), and regardless of the Part under which it has provided services, is reimbursed on a "reasonable cost" basis as defined in 42 U.S.C. § 1395x(v). Numerous other provisions applicable to Parts A and B in common are set out in Part C.[10]

The Commissioner concedes that Part A and Part B constitute components of a single comprehensive health insurance system and are closely coordinated in design and administration. He contends, however, that the legislative history of the passage of Medicare demonstrates that Congress intended to establish two separate plans: Part A, a compulsory social insurance or welfare plan, and Part B, a government-sponsored voluntary individual insurance plan. The Commissioner concludes that this characterization of Part A must determine how benefits received under it are to be treated for purposes of the Tax Code's dependency support test, and that as social insurance or welfare receipts under the authority of *Lutter v. Commissioner, supra, Donner v. Commissioner, supra, Carter v. Commissioner, supra,* and Rev.Rul. 64–222, *supra,* the Part A medical benefits must be included in the amount of Mrs. Kavanaugh's total support as support she had contributed herself.

A consideration of the Congressional debates and of pertinent commentary does reveal a generally accepted characterization of Part A of Subchapter XVIII as a compulsory social insurance or welfare plan and of Part B as a voluntary individual insurance plan.[11] However, this categorization

**10.** Included in Part C are, *inter alia,* such basic provisions as exclusions from coverage, 42 U.S.C. § 1395y, limitations on beneficiary liability when Medicare claims are disallowed, 42 U.S.C. § 1395pp, appeals, 42 U.S.C. § 1395ff, and overpayments, 42 U.S.C. § 1395gg.

**11.** *See, e. g.,* Meyers, *Medicare* (1970), 87–88: The HI [Hospital Insurance (Part A)] program clearly meets the usual definitions of

social insurance. HI can be characterized as a program that is administered by a government agency, that is financed by compulsory contributions (taxes) from the protected persons and their employers (except as to certain older persons at the start of the program, whose benefits are financed from general revenues), and that provides benefits as a matter of right, without any means or needs test, on the basis of satisfying specified

of Part A for certain purposes does not itself conclusively determine the consequences of benefits paid and received under Part A for the specific purposes of the Tax Code's support test. It appears that the Part A and Part B programs were labelled "social welfare" and "individual insurance" primarily as a result of their respective provisions for compulsory and voluntary financing. These different funding methods in turn reflected the legislators' concern with such policy considerations as the desire to guarantee the participation of those citizens sought to be protected [12] and to maintain their dignity and self-respect,[13] concern for the fiscal integrity of the Social Security system,[14] recognition of the relative ease of actuarially projecting hospital costs as compared to physicians' costs,[15] doubts concerning the costs, burdens and fairness of compulsory social insurance-type financing,[16] and concern over the possible intrusive effect of government financing on private physician-patient relationships.[17] Although the foregoing legislative considerations may disclose a variety of reasons underlying the decision to fund Part A largely by means of payroll taxes and to finance Part B through voluntary premiums, they shed no light at all on the intent of Congress as it relates to the dependency support test consequences of benefits paid under Part A.[18]

eligibility conditions as to age and length of coverage.

On the other hand, SMI [Supplementary Medical Insurance (Part B)] does not meet the usual definitions of social insurance, although it may be so categorized by some individuals. Perhaps a better way of designating the SMI program is to call it a voluntary individual insurance program with government subsidy that is underwritten and administered by the government using private carriers to assist with the administration. SMI is a program under which each eligible individual elects, during specified enrollment periods, whether he wishes to participate and pay a premium in partial financial support of the program. If he so elects, then the federal government pays a matching amount equal to the enrollee's premium. SMI has some of the characteristics of social insurance, such as a broad pooling of the risk, administration by a government agency, and establishment by legislative action, but it lacks the compulsory participation basis that is one of the prime characteristics of social insurance. [Footnote omitted]

12. 111 Cong.Rec. p. 7239 (1965) (remarks of Rep. Ullman).

13. *Id.*, pp. 7229 (remarks of Rep. King); 7354–55 (Rep. Farbstein); 15824 (Sen. Ribicoff).

14. *Id.*, pp. 7221–27 (remarks of Rep. Mills and Rep. Byrnes); 7244 (Rep. Secrest); 7363 (Rep. Edwards); 7366 (Rep. Barrett); 7403–04 (Rep. Broyhill).

15. *Id.*, p. 7238 (remarks of Rep. Ullman).

16. *Id.*, pp. 7221–22 (remarks of Rep. Byrnes); 7233–34 (Rep. Schneebeli); 7240–41 (Rep. Betts); 7358–59 (Rep. Fuqua); 7365–66 (Rep. Barrett); 7367–68 (Rep. Clancy); 7393–94 (Rep. Hall); 15869–15872 (Sen. Curtis).

17. *Id.*, pp. 7214 (remarks of Rep. Mills); 7245 (Rep. Secrest); 7392–93 (Rep. Hall).

18. Similarly without decisive significance is the fact that when Congress passed the Medicare Act it also amended § 213 of the Tax Code, to expressly equate medical insurance premiums with payments for medical care, for purposes of determining deductible medical expenses, and to include as such payments amounts paid as premiums under Part B of Subchapter XVII. § 213(e)(1)(C) of the Code, § 106 of the Social Security Amendments of 1965, Pub.L. 89–97, 79 Stat. 286. The taxes which finance Part A of Subchapter XVIII, paid under §§ 3101, 3111, and 1401 of the Code were not so included, since for the specific purpose of determining medical expense deductions, they were considered "not [to] constitute amounts paid for insurance." H.R.Rep. No. 213, 89th Cong., 1st Sess. 179 (1965), *reprinted in* 1965–2 C.B. 733 at 745; *see also* S.Rep. No. 404, 89th Cong., 1st Sess. 197 (1965), *reprinted in* 1965–2 C.B. 758 at 764. We agree with the Tax Court that this Congressional action relating to § 213 does not require a finding that Part A benefits constitute "support" for the purpose of § 152. As the Tax Court observed, 64 T.C. at 728,

"The fact that Congress chose to allow a medical expense deduction under section 213 for the part B premium payments but not for the tax paid to finance part A, has no bearing on the nature of the benefits paid when the risk insured against occurs. There is no necessary correlation between section 213 and sections 151 and 152."

The concurring opinion is equally persuasive in noting that

"The deductibility for tax purposes of the costs incurred in acquiring health insurance coverage does not affect the insurance character of the program provided. The program may (and the hospital insurance program

Furthermore, to distinguish between Part A as social welfare and Part B as individual insurance on the ground that a fundamental element of the former is compulsory participation while the latter is characterized by voluntary enrollment is to ignore statutory provisions as well as pragmatic realities. In fact, participation is legally compulsory in neither but practically compelled in each, and each program is dependent at least in part on compulsory tax revenues.

An otherwise eligible individual may decline to accept hospitalization benefits under Part A, 42 U.S.C. § 1395f(a)(1), and may under both parts opt for alternative health insurance protection. 42 U.S.C. § 1395b. Of course, one who foregoes available Part A Basic Medicare benefits is not exempted from the required payment of the hospital insurance tax under §§ 3101(b) and 3111(b) of the Internal Revenue Code, and conse-

> provided by Part A does) provide a widespread pooling of risks against specified contingencies; provide various benefits specifically spelled out in the program; provide benefits as a matter of right to those in an insured status; and provide specific contribution rates determined in accordance with actuarial methods calculated to meet the estimated costs of the system. These are the relevant criteria, and whether or not a plan meets them is wholly unrelated to the deductibility for tax purposes of contributions to acquire an insured status."
> Id., at 739.

19. In addition, an individual not otherwise eligible for Part A benefits who is 65 or older and enrolled under Part B may now voluntarily enroll in Part A hospital insurance benefits by the payment of fixed monthly premiums. 42 U.S.C. § 1395i–2, as added by the Social Security Amendments of 1972, Pub.L. No. 92–603, 86 Stat. 1374. See 20 C.F.R. § 405.106, Premium Hospital Insurance (1976). Under the rationale of Rev.Rul. 64–223, supra, and Mawhinney v. Commissioner, supra, it would appear that when an individual has enrolled voluntarily in Part A Basic Medicare pursuant to 42 U.S.C. § 1395i–2, his support would be represented by the premium payments made, not by the benefits paid out for hospital expenses incurred. To treat differently those who, like Mrs. Kavanaugh, are entitled to Part A insurance by virtue of their payment of payroll taxes rather than premiums would clearly exalt a formal distinction between means of entitlement over substantive economic similarity.

quently Basic Medicare benefits are not readily refused.[19]

The situation is not conceptually different under Part B, where half of the program is funded by otherwise unappropriated federal revenues, 42 U.S.C. § 1395w, which are generated by individuals as general taxpayers whether or not they choose coverage under Part B Supplemental Benefits. It is also clear that the economic pressure on individuals eligible for Part B benefits to enroll in the supplemental program amounts to practical compulsion to do so. Because the Government underwrites half of the participant's costs of Part B, commercial plans providing benefits equivalent to Part B are unavailable at competitive premium costs.[20] Consequently, the election of Part B coverage by nearly all eligible individuals was anticipated by Congress,[21] is presumed by certain provisions of federal[22] and state law,[23] and is at present a statistically demonstrable fact.[24]

20. See H.R.Rep. No. 92–231, 92nd Cong., 2nd Sess., reprinted in [1972] U.S.Code Cong. & Ad.News 4989, 5054–5055.

21. See H.Rep. No. 213, 89th Cong., 1st Sess. 3 (1965); 111 Cong.Rec. p. 7210 (1965).

22. E. g., 42 U.S.C. § 1395p(f), entitled "Individuals deemed enrolled in medical insurance program," provides in part:

(f) Any individual—
(1) who is eligible [by virtue of his participation in Part A] to enroll in the medical insurance program [Part B] . . .
(2) . . .
(3) . . .
shall be deemed to have enrolled in the medical insurance program established by this part [Part B].
See 20 C.F.R. § 405.210(b), Automatic Enrollment (1976).
In addition, 42 U.S.C. §§ 1395s(a)(1) and (a)(2) provide that an amount equal to the cost of Part B premiums is to be automatically withheld from an eligible individual's Social Security or Railroad Retirement benefits.

23. See, e. g., Codes, Rules and Regulations of the State of New York, Title 11, Insurance, § 52.16(c)(8) (1972), which permits private insurance carriers such as Blue Cross-Blue Shield to terminate coverage when participants qualify for Medicare.

24. Approximately 95 per cent of those aged 65 and over, a total of 21.2 million, were enrolled

Additional aspects of Part A distinguish payments made under it from benefits under social welfare plans. As is the case with other insurance packages, Part A benefits become available as a matter of right only upon the occurrence of the specific medical contingencies set forth in the provisions of the program, 42 U.S.C. § 1395d.[25] Unlike benefits paid under OASDI, *supra*, 42 U.S.C. §§ 401–431; AFDC, *supra*, 42 U.S.C. §§ 601–644; and various state welfare programs which the Commissioner claims to be analogous to Part A, Basic Medicare benefits are not made unconditionally available to the beneficiary, but must be applied exclusively against the cost of the specified contingencies.

### Practical Effect of Part A Benefits on Recipient's Total Support

As indicated above, the provisions of Part A make up a hybrid form of medical insurance, for they contain elements similar to those distinguishing private, individual insurance—regular and periodic payments for specified protection against risk of loss due to specified contingencies; the spreading of the payments against that risk over time and over a pool of participants; the actuarially calculated self-sufficiency of the disbursing fund—as well as elements unlike private insurance—compulsory financing through specially earmarked taxes; the non-deductibility of those payments; and Government sponsorship of the funding. Of all these component parts of Part A, the feature we find most significant in determining the § 152(a) support test consequences of the receipt of Part A benefits is the regular payment by a participant for financial protection against risk of loss, for this classic characteristic of insurance is the essential element of the Part A program which bears most directly on the existing economic relationship between the recipient of the benefits and other sources of support.

In any insurance system providing protection against unexpected medical expenses, the cost of that protection to a participant is plainly measured by the payments made to obtain it. These payments consist of the premiums paid by the policyholder in the case of private individual insurance, and the payroll taxes paid under Part A in the case of Medicare coverage. Although for any particular participant the risk of the events insured against occurring in a given year is generally unpredictable, the amount of the payments required to fund the insurance program is actuarially determined by spreading the risk of loss over a wide number of participants and, for each participant, over a number of years. Thus, while amounts paid out on behalf of any individual as insurance proceeds are likely to fluctuate widely from year to year, the annual payments made to obtain the insurance coverage are readily calculable and constitute the cost for any given year of the medical care thus insured against.

in Part B as of July 1974. 1975 Annual Report of the Board of Trustees of the Federal Supplementary Medical Insurance Trust Fund, H.R. Doc. No. 94–137, p. 2 (1975).

**25.** The Commissioner attempts to distinguish the nature of the provisions for entitlement under Part A of Medicare from the contractual rights of a policyholder in the private medical insurance context by contending that the Government's promise to pay Part A benefits, unlike the promise of a private insurance carrier, is not a legally enforceable contractual obligation but is instead a statutory provision subject to legislative modification. *See Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (individual eligible for OASDI payments, Title II of the Social Security Act, 42 U.S.C. §§ 401–431, held not to have an "accrued property right" to receive them; his interest "cannot be soundly analogized to that of the holder of an annuity, whose right to benefits is bottomed on his contractual premium payments." 363 U.S. at 610, 80 S.Ct. at 1372). Whatever may be the consequences of this characterization *in other contexts, it is* without significance for purposes of the tax support test because the provisions of Part A, as enacted and as uniformly applied, require the payment of hospitalization benefits only upon the occurrence of specified, unpredictable medical emergencies, a contingent requirement exactly parallel to the insurance obligation undertaken by a private carrier.

In this respect Part A of Medicare is identical to private health insurance policies.

As a consequence, the economic relationship between an insurance beneficiary and one who regularly contributes to his support, if it is to be a planned and rational relationship, will reasonably include the routine cost of maintaining medical insurance coverage for the beneficiary as the budgeted "support" cost for his medical expenses, regardless of whether that cost takes the form of private insurance premiums, voluntary Part A premiums, or compulsory Part A taxes. Recognition of this condition appears to be the implicit rationale of the authorities holding private health insurance proceeds not to be includible as support for purposes of § 152(a) of the Code and permitting the deduction of health insurance premiums as medical expenses. *See, e. g., Mawhinney v. Commissioner, supra.*[26] As observed by the Tax Court below, 64 T.C. at 730 n. 1 (concurring opinion of Wilbur, *J.*):

> The average man looks at his health costs as his insurance premiums plus his unreimbursed payments for health care, which accords with the economic realities (and the amount deductible as a medical expense). Viewing large third party payments (made when the contingency insured against occurs) as support can be viewed as distorting the economic realities.

Such a distortion of economic realities would result in this case if the amount of Part A benefits actually paid out on behalf of Mrs. Kavanaugh were included in her aggregate support calculations for the purposes of the support dependency test of § 152(a) of the Code. Mrs. Kavanaugh relied on the taxpayers for the bulk of her normal living costs plus the medical costs for which she would have otherwise been responsible. The fact that certain providers of hospital services received more in Medicare payments from the Federal government on her behalf than Mrs. Kavanaugh received in support from the Turecamos did not change this basic financial relationship. The random and contingent receipt of insurance benefits, whether in form of private insurance proceeds or Basic Medicare benefits under Part A, interrupts but does not alter the otherwise established economic relationship between the beneficiary, Mrs. Kavanaugh, and the Turecamos, who regularly contributed to her support.[27] To deny taxpayers in the position of the Turecamos the right to claim as a dependent a relative like Mrs. Kavanaugh because her hospitalization costs were covered by government-sponsored Part A Basic Medicare insurance rather than privately obtained commercial hospitalization insurance would be to ignore the economic substance of Part A of the Medicare in deference to formal characteristics.

For the foregoing reasons, the decision of the Tax Court is affirmed.

---

**26.** Perhaps as a matter of conceptual symmetry, payroll taxes paid to finance participation in Part A should be deductible as medical expenses. As we have noted, however, Congressional failure to provide such a deduction is not indicative of legislative intent to characterize Part A benefits as "support" under § 152(a) of the Code, *see* n. 18 *supra,* and the concurring opinion of the Tax Court below has pointed out the considerable administrative difficulties which would be involved if the Part A hospital insurance tax were made deductible. 64 T.C. at 738 n. 21.

**27.** The receipt of annuity proceeds by an individual in need of financial assistance has an altogether different effect on his economic relationship with a third party who contributes to his support. The regular receipt of predictable payments through private annuities or public welfare annuities such as OASDI may be understood to reduce the recipient's dependency on the contributing third party on a continuing basis, to the extent of the annuity or welfare benefits being received. Such was the case of Mrs. Kavanaugh in 1970, and the taxpayers readily concede that the $1,140 in social security benefits she received properly constitute support attributable to her for purposes of the § 152(a) dependency support test. *See* Rev. Rul. 64–222, 1964–2 C.B. 47.